## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Matthew Ekstrom, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I submit this affidavit in support of finding probable cause to search an electronic device (hereinafter referred to as "the Subject Device"), recovered following the arrest of Andrew Brace on July 15, 2024. The Subject Device is described with greater particularity in Attachment A, attached hereto and incorporated herein. The applied for warrant would authorize the forensic examination of the Subject Device for the purpose of identifying electronically stored data particularly described in Attachment B. Specifically, law enforcement recovered and currently has secured in Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") custody in the ATF Field Office in Burlington, Vermont, the following:

   a. A black Samsung cellphone, with a damaged front screen and assigned ATF evidence item number PROP-66578 (the Subject Device), currently in the custody of the ATF's Burlington, VT Field Office.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been so employed for over twenty years. In my capacity as a Special Agent, I am familiar with the federal laws relating to federal firearms and controlled substance violations, have been trained in the investigation of violations of said laws, and have participated in such investigations.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

1

4. Based on the facts as set forth in this affidavit, there is probable cause to believe the information described in Attachment A contains evidence of knowing possession of a firearm by a previously convicted felon, in violation of 18 U.S.C § 922(g)(1); knowing possession of a firearm by a user/abuser of a controlled substance, in violation of 18 U.S.C. §922(g)(3); knowing possession of a stolen firearm, in violation of 18 U.S.C. § 922(j); and possession of a controlled substance, in violation of 21 U.S.C. § 844, as described in Attachment B.

## PROBABLE CAUSE

5. In June and July of 2024, Andrew Brace engaged in multiple high-profile confrontations with law enforcement in Vermont. In one such incident, when Brace was encountered by law enforcement in a stolen vehicle, he assaulted an officer by dragging him fifty feet with his car before getting away. During another incident, Brace attempted to run Vermont State Police (VSP) cruisers off the road while driving erratically at high speeds.

6. On July 9, 2024, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Task Force Officer (TFO) Robert Currier and United States Fish and Wildlife Service (USFWS) Special Agent Eric Holmes, while assisting the Grand Isle Sheriff's Department (GISD), attempted to take Brace into custody after Brace had attempted to elude law enforcement in a stolen Ford F-150 (VT tag# HUTNCPA) and subsequently fled on foot. During the incident, Brace's posture and statements made TFO Currier and Agent Holmes believe Brace was in possession of a firearm and planning to use it against them. Specifically Brace had his right hand in his waistband and appeared to be holding onto something. Brace told TFO Currier that he had a gun, repeated this statement multiple times, and then stated something to the effect of "I'll do it". Brace was able to get into a nearby truck and as Brace made his escape, Brace nearly hit TFO Currier and Agent Holmes with the truck.

7. The F-150 (VT tag# HUTNCPA) was later recovered from Champlain Street in Swanton, VT and towed to the Vermont State Police (VSP) barracks in St. Albans, VT. Upon searching the vehicle with the vehicle's owner, Dana Kittell, a Marlin Firearms Company 917V .17 caliber rifle (s/n 94638184) was located and taken into VSP custody by VSP Trooper Bellinghiri. On July 17, 2024, Warden Thiel took custody of the rifle from VSP and brought it to ATF's Burlington Field Office where ATF Special Agent Samuel Brown took custody of it. Investigation revealed the firearm had been reported stolen from a vehicle in front of 75 Hunt Street in Fairfax, VT on July 8, 2024. The reporting party was Paula Meunier who stated the firearm belonged to her son, Sylas Meunier. Ms. Meunier told Agent Brown that the firearm may have been stolen around July 4, 2024, but they did not report it stolen until the 8th in the hopes that they had only lost it.

8. A review of Brace's criminal history indicated he has six felony convictions as well as two misdemeanor domestic violence convictions:

   a. Misdemeanor domestic violence on July 28, 2003, in Chittenden County, VT District Court (docket# 1488-3-03).

   b. Felony unlawful trespass on October 18, 2004, in Franklin County, VT District Court (docket# 1524-12-03).

   c. Felony unlawful trespass of an occupied residence on September 13, 2011, in Chittenden County, VT District Court (docket# 608-2-11).

   d. Felony forgery on January 15, 2014, in Chittenden County, VT District Court (docket# 867-3-13).

   e. Felony burglary on January 15, 2014, in Chittenden County, VT District Court (docket# 469-2-13). It should be noted that for this conviction he was sentenced to incarceration for between thirty months and eight years.

   f. Felony violation of an abuse prevention order on March 30, 2016, in Franklin County, VT District Court (docket# 1421-12-15).

    g. Misdemeanor domestic violence on March 30, 2016, in Franklin County, VT District Court (docket# 988-9-15).

    h. Felony eluding law enforcement with negligent operation on December 12, 2023, in Chittenden County, VT District Court (docket# 21-CR-01193).

9. On July 12, 2024, a Vermont state arrest warrant was issued for Brace for a variety of charges including two counts of felony aggravated assault with a weapon.

10. On July 15, 2015 [handwritten: 24 mk], at approximately 6:45a.m., law enforcement encountered Kristin Verchereau in a stolen Lincoln Aviator in Colchester, VT. Law enforcement took Verchereau into custody and brought her to the Colchester Police Department (CPD). TFO Currier and Deputy United States Marshal (DUSM) Zachary Smith learned of the arrest and traveled to CPD to speak with Verchereau. Prior to their arrival, they learned that Verchereau told CPD investigators that Brace was intending to "shoot it out" with law enforcement and commit suicide by cop. She also noted that Brace was possibly in possession of a firearm, though she later changed her statement to say that Brace was actively looking to acquire a firearm.

11. At approximately 10:15a.m., TFO Currier and DUSM Smith spoke with Verchereau in an interview room at the CPD. Verchereau told investigators that she was assaulted by Brace earlier in the morning and she stole the Lincoln in order to get away from him. She said Brace had stabbed her, bit her, and beat her. Verchereau told investigators that Brace is an active user of heroin and crack cocaine.

12. TFO Currier inquired into Brace's potential possession of a firearm, specifically the rifle that was recovered on July 9, 2024 from the stolen Ford F-150. Verchereau stated she was in the vehicle with Brace that day. She explained that when Brace left the vehicle in a field and fled on foot, she hid in the grass to avoid detection. Verchereau also said that Brace was in

4

possession of the recovered rifle prior to stealing the F-150. She stated that Brace brought the rifle with him into the truck and it was not in the vehicle prior to Brace stealing it. Verchereau said that Brace was also looking for a firearm so that he could use it to commit suicide by cop and added that Brace was "on a death wish".

13. On July 15, 2024, ATF Special Agents and task force officers located and arrested Brace pursuant to his state arrest warrant as well as a suspected violation of 18 U.S.C. § 111(a)(1). At the time of the arrest, Brace was the driver of a maroon Jeep Cherokee and Kimberly Rooney was the passenger.

14. During a search incident to arrest of Brace's person, Agent Brown located a needle cap in Brace's pocket. ATF Special Agent Eric Brimo spoke with Rooney on scene and learned she had met with Brace earlier in the day. She said she provided Brace with forty dollars to buy drugs (though it was unclear to investigators if the drugs were for Rooney's use or for her and Brace to use together). When asked about Brace's drug use, Rooney stated that Brace uses "everything". She said she was not aware of any firearms or other weapons in the vehicle. Rooney consented to a search of her personal property in the vehicle. Investigators located numerous items of drug paraphernalia. After the search, Rooney was allowed to take her belongings and leave the scene.

15. Based on the needle cap located in Brace's pocket and statements by Rooney and Verchereau, investigators searched the Jeep for further evidence of a suspected violation of 21 U.S.C. §§ 841 and 844. Upon searching, investigators located and seized the Subject Device from the driver's seat of the Jeep.

### TRAINING AND EXPERIENCE

16. Based on my training and experience, I also know the following:

a. People who cannot legally possess firearms often use communication devices, such as cell phones, as a way to acquire firearms from other people. Once firearms have been acquired, people often possess these firearms for long periods of time because they cannot legally acquire other firearms. These people often also possess and purchase other items pertaining to the possession of firearms, including, but not limited to: gun cases, original gun packaging boxes, ammunition, ammunition magazines, holsters, targets, parts and accessories for firearms, firearm cleaning equipment, and documents and other information relating to the acquisition, purchase, sale, and/or repair of all these items. Some of these items (either the firearms themselves or the items related to firearms including purchase records) may be found on a person's cell phone in the form of photographs, videos, emails, text messages or documents.

b. People who use controlled substances, including cocaine base and heroin, frequently use communication devices such as cell phones as a way of contacting distributors. These communications may occur for the user to determine if the supplier has a particular drug available for purchase, to arrange and negotiate drug transactions, or to complain about the low quality (or alternatively to praise the high quality) of purchased drugs. People who use controlled substances also may send photographs of drugs in their possession to other users, or even back to their distributor. For example, a user might send a photo of the drugs they purchased while the drugs are on a digital scale, and complain to the distributor that they did not get the quantity for which they had paid.

c. People retain cellular telephones for multiple years at a time. When people get a new phone, generally information from the old phone is transferred to the new phone and thus information from a number of prior phones could be located on the most current phone.

6

d. Friends communicate with each other about coordinating plans to get together. These communications may include messages received by or sent from the devices, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received. The device may also contain GPS or similar location information indicating where the devices have traveled as well as photographs or videos.

e. Individuals who commit crimes together or who know about crimes committed by their close associates, may communicate about those crimes through electronic communications that would be stored on a cellular telephone. The communications would be similar to those noted in subparagraph "c".

f. Persons who participate in the criminal activity frequently use cellular telephones, among other communications devices, to coordinate their unlawful activities and to maintain contact with suppliers and consumers of illegal drugs.

g. Information stored in the memories of these communication devices constitutes evidence of criminal activity. Among other things, the evidence may contain the telephone numbers assigned to the communication devices, messages received by or sent from the devices, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received. The device may also contain GPS or similar location information indicating where the devices have traveled.

h. With their cellular phones, those involved in criminal activity often take photographs or videos of their illegal activities (including possession and use of controlled

substances), guns, associates, and locations associated with their illegal activity. These photographs or videos may be stored in the memory of those cellular phones.

## INFORMATION REGARDING ELECTRONIC STORAGE AND FORENSIC ANALYSIS

17. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

18. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Subject Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Subject Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

8

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

19. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Subject Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that will capture all files and databases stored on the Subject Device. These files and databases would then be parsed by a digital forensic tool so the data can be reviewed by an investigator. Although some data may contain a date and timestamp, some data may not. Thus, the entire data set must be parsed and reviewed in a digital forensic tool by the investigator to determine how the data applies to the context of the warrant. Much like the execution of a search of a physical location requires observing items to determine if they are evidence of the crimes under investigation, the review of data from the Subject Device will determine what evidence will be seized as described in Attachment B.

20. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

21. Based on the foregoing, I submit there is probable cause to search the contents of the Subject Device, specifically described in Attachment A, for the evidence delineated in Attachment B of the Application. Because this warrant seeks only permission to examine the Subject Device already in law enforcement's possession, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Dated at Burlington, in the District of Vermont, this 5th day of August, 2024.

_____
MATTHEW EKSTROM
Special Agent, ATF


Sworn to and subscribed before me this 5th day of August, 2024.

_____
HONORABLE KEVIN J. DOYLE
United States Magistrate Judge